688 P.2d 192

**Carlos Sanz ANTON, Petitioner,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**James Perkins dba Perkins Pulpwood, Respondent-Employer.**

**No. 1 CA–IC 2934.**

Court of Appeals of Arizona, Division 1, Department B.

June 26, 1984.

Wilson, Gaylord & Grimsrud by Richard M. Grimsrud, Flagstaff, for petitioner.

Sandra A. Day, Chief Counsel, Indus. Com'n of Arizona by Roger Rea, Phoenix, for respondent.

Jerry L. Smith, Flagstaff, for respondent-employer.

## OPINION

CORCORAN, Judge.

The question we resolve in this special action is whether a worker, who serves as an instrumentality or conduit through which the business owner conducts virtually every discretionary facet of his enterprise, is an employee or an independent contractor for the purposes of workers' compensation law. We hold that such a worker is an employee. The findings and award of The Industrial Commission, which conclude that petitioner was an independent contractor during the relevant periods of his association with respondent-employer Perkins and therefore is not entitled to workers' compensation benefits, are set aside.

### I

Petitioner Carlos Sanz Anton's association with respondent-employer James Perkins, dba Perkins Pulpwood, began in February 1976. Perkins hired petitioner and other woodcutters under a written contract which is written in English. Petitioner is a native of Spain and testified through an interpreter. The contract required the woodcutters to fell trees, cut them into logs, stack the logs into cords, and finally clean up the surrounding area of the forest. Perkins, aided by an assistant, would then pick up the stacked logs using a truck specially designed for that purpose and deliver them to Southwest Forest Industries, Inc. (Southwest). Perkins checked his woodcutters' work, including petitioner's, to see if they cut the right logs into the right size, selected the right quality, stacked the wood right, cleared the forest correctly and did not work too slowly.

Petitioner continued to work for respondent Perkins until October 1977. He then quit to work for other pulpwood contractors in the area. Sometime in 1980 Perkins phoned petitioner and urged him to return to work for him. Petitioner agreed, ultimately beginning again in January 1981. Petitioner worked continuously through approximately July 1981 when he hurt his back while working. He continued working irregularly into December 1981 when, because of his injury, he could no longer cut and stack and clean up.

Although Perkins prepared a written contract for 1981, petitioner did not sign that contract. It is undisputed, and the respondent Commission admitted during oral argument, that the unsigned 1981 contract does not control the rights of the parties. The administrative law judge (ALJ) also found no valid binding written contract between the parties and noted that the absence of a written contract was not of controlling significance in deciding the independent contractor issue.

We agree that neither the absence nor the presence of a written contract controls the resolution of the question of whether petitioner was an employee or an independent contractor. It is not the appellation which the parties give to the relationship, *Industrial Commission v. Meddock*, 65 Ariz. 324, 331, 180 P.2d 580, 585 (1947), but rather the objective nature of the relationship, determined upon an analysis of the totality of the facts and circumstances of each case, which is determinative. *Id.; Home Ins. Co. v. Industri-*

*al Commission,.* 123 Ariz. 348, 599 P.2d 801 (1979). Thus, it is appropriate for us to consider all facts which might show the nature of the 1981 oral employment agreement that concerns us in this special action.

## II

■ Before proceeding to a substantive analysis of the issue facing us we must determine the appropriate standard of appellate review. First, it is settled in Arizona that the ALJ is the trier of fact: *Factual* determinations must be reviewed in a light most favorable to sustaining the Commission's award. A.R.S. § 23–951(B); *Micucci v. Industrial Commission,* 108 Ariz. 194, 494 P.2d 1324 (1972). However, the finding that petitioner is an independent contractor is a *conclusion* of law. *Industrial Commission v. Meddock,* 65 Ariz. at 327, 180 P.2d at 582. Therefore an appellate court must make an independent determination of the legal issue. *Wilkinson v. Takesuye,* 66 Ariz. 205, 185 P.2d 778 (1947).

■ Second, when reviewing a Commission award, we are guided by the purposes which gave rise to the enactment of workers' compensation constitutional provisions and statutes which are remedial and designed to provide compensation for those persons injured in business or industry, Ariz. Const. art. 18, §§ 3, 7 and 8; *Daniel v. Magma Copper Co.,* 127 Ariz. 320, 323, 620 P.2d 699, 702 (App.1980), and our constructions of them should be liberal in order to effectuate that purpose. *Peter Kiewit Sons' Co. v. Industrial Commission,* 88 Ariz. 164, 354 P.2d 28 (1960); *Young v. Environmental Air Products, Inc.,* 136 Ariz. 158, 163, 665 P.2d 40, 45 (1983). The required liberality of interpretation extends to the concept of an "employee" in workers' compensation law. *Hughes v. Industrial Commission,* 113 Ariz. 517, 519, 558 P.2d 11, 13 (1976).

With these two considerations specifically in mind, we now consider the substance of this appeal.

## III

Because we are bound by the factual findings of the ALJ, we wish to state clearly at the inception of our analysis that we do not find the ALJ's findings of fact to be erroneous. Accordingly, we do not set aside the award of the Commission because it is demonstrably contrary to the evidence in the record. We hold, however, that taking as true the factual findings of the ALJ, the facts that are undisputed and those facts not specifically addressed by the ALJ but overwhelmingly supported in the record, still the legal conclusion that petitioner was an independent contractor is not justified.

Southwest purchases pulpwood timber under contract from the United States Forest Service. The Forest Service marks trees to be harvested and Southwest engages contractors to harvest and deliver the "short wood" to Southwest's yard. Respondent Perkins is one such contractor. Southwest gives written detailed instructions to each of its pulpwood contractors as part of the contract between Southwest and these contractors. Set out below is the full text of these specifications:

### SCHEDULE B TO PULPWOOD CONTRACT

### PULPWOOD SPECIFICATIONS

1. All wood must be sawn into lengths of not less than 60″, nor more than 63″.

2. All pulpwood sticks shall be reasonably straight, sound and free of rot and blue stain.

3. No wood under 4″ in diameter inside of bark, or over 18″ in diameter inside of bark will be accepted.

4. All wood must be cut square with a saw. No axe cut wood will be accepted.

5. All limbs must be trimmed smooth with the body of the stick.

6. Neither split nor forked wood will be accepted.

7. No fire-charred wood will be accepted.

Respondent Perkins testified that he makes no changes in these Pulpwood Specifications, but merely passes them on verbatim to his woodcutters. The contracts executed between Perkins and each of the 10 to 12 woodcutters normally employed by him specifically require that the woodcutter "cut all pulpwood to the specifications set forth in Schedule B hereto, which specifications are by reference incorporated herein and made a part hereof." Although the 1976–77 contract which petitioner signed does not specifically incorporate written specifications originating with Southwest, it states that respondent Perkins "is presently harvesting and delivering pulpwood pursuant to written agreement and is desirous of sub-letting the performance of a part of said contract; and, ... [petitioner] proposes to perform for and on behalf of the contractor ...." Thus for some years respondent Perkins has engaged woodcutters to render the performance of "part" of his contract with Southwest "for and on behalf of Perkins." Perkins' contract with Southwest also required that he clean up the forest in the wake of harvesting and cutting the trees. This responsibility also fell to the woodcutters who worked for Perkins. Last, even the type of cutting tool was controlled; use saw, no axe.

Perkins, thus, reserved to himself only the task of picking up the wood and driving it to Southwest's yard. By contrast his woodcutters were hired to conduct virtually every facet of his business enterprise which concerned the quality of the product/service he had contracted to provide to Southwest. It was even Southwest, not Perkins, who decided which trees were to be cut. Perkins would intervene in his woodcutters' performance of his contract with Southwest only if they failed to cut a tagged tree, did not properly clean up the forest or did not properly stack the short wood. Perkins only very rarely needed to correct petitioner on any of these points and then only when he first began working in 1976. Perkins had the right to control petitioner's execution of Perkins' contract with Southwest but, because of petitioner's skill and competence, the rarity of the occasion to correct him permitted Perkins freedom to devote his time to delivering the cut wood to Southwest and policing the work of his woodcutters generally.

Perkins paid his woodcutters a fixed amount for each cord of wood they cut, $14 per cord in 1981. However, he did not pay them on a "by-the-job" basis for each cord. Instead they received weekly checks calculated according to the number of cords cut during the relevant pay period. Perkins did not, however, take withholding tax from their pay checks. The woodcutters supplied their own equipment including the chain saw and their gloves and they repaired and maintained their own equipment. Perkins did not require that they work during specific hours of the day; e.g., 8 a.m. to 5 p.m. Perkins did require, though, that his woodcutters cut and clear the area of the forest he assigned them, progressing at a reasonable pace and steady rate. He testified that on at least one occasion in 1981 he had "discharged" a woodcutter because

> ... he [the woodcutter] was so slow ... there was no way he could fulfill the contract. It took him forever to cut wood.... We're always moving in the area. If the guy cuts five cords of wood or one load of wood in a week and a half, he's way behind on the area. It's not feasible to keep him on, and the guy just couldn't keep up.

The contracts Perkins required of his woodcutters ordinarily covered a span of approximately a year and set a minimum number of cords of wood that were to be cut within that time, as well as providing payment by the cord on a weekly basis. The woodcutters could hire people to help them with their work, although the record does not show that any of Perkins' wood-

cutters ever hired their own employees. If Perkins unilaterally determined that the woodcutters were not performing as agreed, then Perkins could unilaterally terminate and void the contract if they had not corrected their operations within 24 hours after they had received written notice from him of alleged defects in their operations.

## IV

We now analyze the legal conclusions and inferences permitted by the facts in the record:

A.R.S. §§ 23–902(A) and (C) state:

A. Employers subject to the provisions of this chapter are ... every person who has in his employ any workmen ... regularly employed in the same business ... under contract of hire .... For the purposes of this section "regularly employed" includes all employments, whether continuous throughout the year, or for only a portion of the year, in the usual trade, business, profession or occupation of an employer.

. . . .

C. A person engaged in work for another, and who while so engaged is independent of the employer in the execution of the work and not subject to the rule or control of the person for whom the work is done, but is engaged only in the performance of a definite job or piece of work, and is subordinate to the employer only in effecting a result in accordance with the employer's design, is an independent contractor, and an employer within the meaning of this section.

Neither respondent Commission nor respondent Perkins has taken the position that Perkins is not an employer or that petitioner is not a worker or employee under A.R.S. § 23–902(A). *See also* A.R.S. § 23–901(5). The contention of the Commission on appeal is that "the Applicant [Sanz Anton] was an independent contractor [under A.R.S. § 23–902(C)] and [therefore] not an employee of Perkins." This is where the focus of our inquiry lies.

In considering whether petitioner Sanz Anton was an independent contractor, we rely on *Home Ins. Co. v. Industrial Commission,* 123 Ariz. 348, 599 P.2d 801 (1979), which held that

The right to control or supervise the method of reaching a specific result determines whether an individual is an employee or an independent contractor.

*Id.* at 350, 599 P.2d at 803. In determining the status of petitioner the independent contractor issue must be resolved only after considering "the totality of the facts and circumstances of each case, examining various indicia of control." *Id.* The "right to control" a worker's activities must be exercised within the context of an ongoing and integral business process before the worker will be deemed an employee. The relevant indicia include those factors set out in *Home Ins.:*

... the duration of the employment; the method of payment; who furnishes necessary equipment; the right to hire and fire; who bears responsibility for workmen's compensation insurance; the extent to which the employer may exercise control over the details of the work, and *whether the work was performed in the usual and regular course of the employer's business.*

123 Ariz. at 350, 599 P.2d at 803 (emphasis added).

Our task here is to determine whether an entrepreneur may, by "contract" or otherwise, insulate himself from responsibility for providing workers' compensation insurance by giving up the right to control virtually every discretionary facet of his enterprise. We agree with Larson that the:

... "extent of control" [test is] ... actually delimited by the test of "nature of the work," that is, by the question whether the work is part of the employer's regular business or operation. When loading, trucking, and the like have to be keyed in with the integral production pattern, the modern tendency is to infer that the employer must neces-

sarily have reserved the right to control as many details as are necessary to keep all the gears in his production machine smoothly meshed together.

1C A. Larson, *Workmen's Compensation Law*, § 44.20 at 8–61 (1982).

*Marlow v. Dexter Wood Products*, 47 Or.App. 811, 813, 615 P.2d 402, 404 (1980) illustrates the significance pointed out by Larson of the nature of the claimant's work in relation to the employer's work. The Oregon Court of Appeals faced, as we do here, the task of "trying to put an extremely ill-defined and informal working arrangement into legal pigeonholes." 47 Or.App. at 812, 615 P.2d at 403. The court found the key consideration to be that the alleged independent contractor, the claimant Marlow, was engaged in "an ongoing basic employment activity [of the employer] Dexter as opposed to an occasional or incidental part of Dexter's normal operations." *Id.* at 813, 615 P.2d 404. Marlow answered a newspaper advertisement seeking workers to cut shake bolts for $50 a cord plus an additional $5 for each cord the worker helped load for transportation. According to the claimant, the arrangement was verbal and according to the employer there was a written contract which, however, was purportedly lost in a burglary. The claimant chose when and how long he worked each day, cut the shakebolts by his own method, used his own equipment, and even recruited other workers and formed a team to cut and split wood, a factor not present in the case before this court. However, the employer specified the areas from which to cut the dead cedar, the size of the shakebolts, their quality, the way they were to be stacked and bundled; it also policed the workers' compliance with these requirements and on occasion refused certain sub-standard wood. Either party could end the relationship without contractual liability. Additionally,

> The job had a potential duration of five years and was an *ongoing basic employment activity* of Dexter as opposed to an occasional or incidental part of Dexter's normal operation.

47 Or.App. at 813, 615 P.2d at 404 (emphasis added). With the exception of the factors cited in the above quotation and the fact that either party could terminate his arrangement without notice or liability, the other factors cited in *Marlow* as suggesting that claimant was an employee are rather equivocal.

■ If the claimant's work is an *integral* part of the employer's *regular* business, the relative nature of the claimant's work bears heavily on the question of whether the claimant is an employee or an independent contractor. Larson, *supra*, § 43.53 at 8–22, 8–23. It is for this reason that the ALJ's reliance on *Southwest Lumber Mills, Inc. v. Industrial Commission*, 60 Ariz. 199, 134 P.2d 162 (1943) is misplaced.

The ALJ in her conclusions of law attempted to draw an analogy between *Southwest* and the circumstances of this case. In *Southwest* our Supreme Court, construing and applying the present A.R.S. § 23–902(B), found that the claimant (analogous to petitioner Sanz Anton here) was the employee of the pulpwood contractor Gibson (analogous to respondent Perkins), but *not* of Southwest Lumber Mills, Inc. (analogous to Southwest Forest Industries, Inc.) The court there found that Gibson was an independent contractor in relation to Southwest (which itself had a permit from the Forest Service to cut and remove standing timber) because it contracted for him to perform "a finished job of reducing the timber to logs and delivering them to the mill pond, all for a specified price." 60 Ariz. at 206, 134 P.2d at 165. The court did not reach the issue that faces us in the present case. It was not disputed that the claimant was an employee of the logging contractor Gibson, who had been declared a bankrupt. The court did not address the present A.R.S. § 23–902(C), but decided only that the claimant was not an employee of Southwest Lumber Mills, Inc., because Gibson was not its employee. *But cf. Ringling Bros. & Barnum & Bailey Combined Shows, Inc. v. Superior Court*, 140 Ariz. 38, 680 P.2d 174 (App.1983).

Still, it is clear that while the claimant was doing a job which was regularly associated with Southwest's enterprise and, similarly, the contractor Gibson was performing a service which was regularly associated with that same business enterprise, Gibson and his employee (claimant) did nothing more than supply Southwest with the raw materials it needed for its business. Southwest's business was not merely that of cutting and removing standing timber to a sawmill. Indeed one could say that its business only began once the logs were delivered to its sawmill. Thus, although receipt of logs at its sawmill is a regular and necessary ongoing requirement of its business, in the facts of that case the process which began with standing timber and ended with delivery of that timber to the sawmill need not concern it once it had made a contract to produce the result it wanted: delivery of the timber to its mills on a steady basis. In this case, no claim has been made that petitioner is a statutory employee of Southwest. *See* A.R.S. § 23–902(B). Also, no issue has been presented regarding the relationship between Perkins and Southwest. We therefore are not here construing A.R.S. § 23–902(B).

By contrast, in this case respondent Perkins did not attempt to contract for a particular well-defined incidental activity which is ancillary to the central concerns of his business. Perkins attempted to contract out not merely an integral part of his business, but rather the ongoing basic employment activity. The activity itself, woodcutting, essentially *defined* his business.

*Southwest Lumber Mills, Inc.,* is one of a number of decisions by the Arizona Supreme Court whose factual pattern demonstrates the importance of the relative nature of the work factor in delimiting the concept of the right of control. In *Alexander v. Alexander,* 51 Ariz. 269, 76 P.2d 223 (1938), Arizona Asparagus Farms, Ltd., hired John Alexander, the son of claimant H.H. Alexander, to use his asparagus fern machine to mulch the old growth in preparation for planting a new crop. Even though compensation was calculated by the acre, the court found that Asparagus Farms had retained the right to and actually did control the manner of using the machine by the son and anyone he employed to use it. It is readily apparent that cutting back the old growth from the prior season's crop of asparagus so as to provide a mulch for the next year's crop is so integrally related to the business of growing asparagus that the only reasonable inference is that the employer necessarily reserved the right to control all its details in order to insure the proper growth of the new asparagus crop.

In *Industrial Commission v. Meddock,* 65 Ariz. 324, 180 P.2d 580 (1947), a rock quarry owner hired quarriers under contracts which called them "independent contractors" as a ruse to avoid paying premiums on them for workers' compensation insurance. The quarriers were paid by the ton, were given the "right to possession" of designated pits, subject to the quarry owner's rights to inspect their work and to enter the pits to load and transport the mined rock. The quarriers were not required to work a specified number of hours per day. The quarriers knew they had no workers' compensation coverage.

*Meddock* noted that the record was "replete" with testimony by other quarriers to the effect that no control or supervision was exercised over them and there was no fixed quota or output required. Moreover, there was evidence that the quarrier supplied his own tools and equipment and could hire other workers if he so wished. Still the court noted, as in the case before us, that the quarriers could be discharged on 24 hours notice. While stating that the relation of the parties should be determined from all surrounding indicia, and that the right to fire did not necessarily make a contractor a mere servant, the court stated that even so

"... there must exist some actual independency on the part of the contractor, ... a mere shadowy or superficial ap-

pearance of such is not enough to take from the employer responsibility for labor and services actually rendered for his use and benefit on the claim or pretext of an independent contract."

65 Ariz. at 330, 180 P.2d at 584. The quarry owner, having hired quarriers to conduct the very heart of his business, necessarily had to have control over sufficient details of their work to keep his production and delivery running smoothly. The court found that in reality the quarry owner did exactly that.

 The facts of this case show unequivocally that petitioner Sanz Anton was an employee of Perkins and not an independent contractor. Perkins tried to comply with the terms of his contract with Southwest by channeling the completed product of the woodcutters' labors to Southwest, with Perkins serving as little more than a conduit. The woodcutters could not "be said to be engaged in a skilled occupation or a distinct business." *Industrial Commission v. Meddock*, 65 Ariz. at 331, 180 P.2d at 585. Woodcutting has even from ancient times been regarded as one of the menial tasks in life. *See Joshua* 9:21–27 (the Gibeonites were cursed for their deceit and enslaved as "hewers of wood and drawers of water"). All semblance of independent judgment was taken from the woodcutters by the very explicit terms of the contract from Southwest which Perkins passed on to them. Perkins reserved to himself the right to police the woodcutters' activities, calling to their attention material deviations from the specifications he had set forth in their contracts. The woodcutters were not paid as independent contractors, but were paid on a weekly basis, depending upon the quantity of wood they cut, and the only reasonable inference from the facts in the record is that the woodcutters could continue to work for Perkins indefinitely so long as they cut quickly enough to permit Perkins to integrate and coordinate their progress with that of the other woodcutters. Finally, supplying pulpwood to Southwest was not merely *in* the regular course of Perkins' business, *it was Perkins' business.* Under these circumstances the fact that he could hire or fire them without contractual liability, *Industrial Commission v. Meddock, supra,* is not so much a premise from which we can conclude that they were the instrumentalities through which he carried on his business, but rather, the fact that they carried out his business explains why he had to have the right to hire or fire them in the first place. Therefore, the nature of the woodcutters' activities relative to Perkins' business permit only one reasonable inference: Perkins had the right to control those details of their activities necessary to a successful ongoing pulpwood business. Indeed, there is little else Perkins could do to control petitioner save cutting the wood himself.

The facts before us clearly show a business entrepreneur who, while taking great pains to disclaim the right to control his employees except as to the end result of their labors, simultaneously "contracted out the very heart" of his own enterprise. Larson, *supra,* § 43.51 at 8–17, 8–18. We hold that under the facts of this case such hirelings, whose work is the "very heart" of the entrepreneur's business, whose efforts are expended in the usual and regular course of the owner's business, and whose job is an ongoing basic employment activity of the business owner as opposed to an incidental part of the owner's normal operation, are not independent contractors for the purposes of workers' compensation law.

We hold, therefore, that petitioner Sanz Anton was an employee of respondent Perkins. The award of the Industrial Commission is set aside.

MEYERSON, P.J., and BROOKS, J., concur.